UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MATTHEW SHIMER,

         Plaintiff,

    v.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

         Defendant.

No.  2:13-CV-02200 AC

ORDER

     Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act and supplemental security income ("SSI") under Title XVI of the Act.  The parties cross-motions for summary judgment are pending.  For the reasons discussed below, plaintiff's motion for summary judgment is denied and the Commissioner's cross motion for summary judgment is granted.

PROCEDURAL BACKGROUND

     Plaintiff filed his application for DIB on November 19, 2010, alleging disability beginning on April 1, 2009.  Administrative Record ("AR") 152–168.  Plaintiff's application was denied initially on May 2, 2011, AR 64–66, and again upon reconsideration on June 24, 2011, AR 78– 82.  On February 22, 2012, a hearing was held before administrative law judge ("ALJ") Gary J.

Lee.  AR 37–56.  Plaintiff appeared and testified at the hearing, and was represented by attorney

Bradford Myler.  Id.  A vocational expert named Linda Ferra attended the hearing but did not

testify.  Id.  In a decision dated March 2, 2012, the ALJ found plaintiff not disabled.  AR 21–31.

The ALJ made the following findings (some citations to 20 C.F.R. omitted):

> 1.  The claimant meets the insured status requirements of the Social Security Act through September 30, 2014 (Ex. 10D).
>
> 2.  The claimant has not engaged in substantial gainful activity since April 1, 2009, the alleged onset date.
>
> 3.  The claimant has the following severe impairment: degenerative lumbar disc disease status post laminectomy.
>
> 4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.
>
> 5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform the full range of sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a).
>
> 6.  The claimant is unable to perform any past relevant work.
>
> 7.  The claimant was born on April 5, 1978 and was 30 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date.
>
> 8.  The claimant has at least a high school education and is able to communicate in English.
>
> 9.  Transferability of job skills is not material to the determination of disability because applying the Medical-Vocational Rules directly supports a finding of "not disabled," whether or not the claimant has transferable job skills.
>
> 10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.
>
> 11. The claimant has not been under a disability, as defined in the Social Security Act, from April 1, 2009, through the date of this decision.

AR 26–31.

Plaintiff requested review of the ALJ's decision by the Appeals Council, but it denied

review on August 22, 2013, leaving the ALJ's decision as the final decision of the Commissioner

1  of Social Security.  AR 1–6.

2                                              FACTUAL BACKGROUND

3            Born on April 5, 1978, plaintiff was 30 years old on the alleged onset date of disability

4  and 33 years old at the time of the administrative hearing.  AR 152.  Plaintiff did not engage in

5  substantial gainful activity during the period between April 1, 2009 and February 22, 2012.  AR

6  26.  Plaintiff worked full-time on a farm driving a tractor and performing other tasks such as

7  pruning trees and hoeing weeds for approximately twelve years.  AR 42.  Plaintiff stopped his

8  work when he started having problems with his back.  Id.  On September 16, 2009, plaintiff

9  underwent surgery on his back described as lumbar laminectomy, discectomy and fusion at L4-L5

10  and L5-S1.  AR 284–86.  The surgery was performed by Dr. Majid Rahimifar.  Id.; see also AR

11  268–69, 283–86.

12                                              LEGAL STANDARDS

13            The Commissioner's decision that a claimant is not disabled will be upheld if the findings

14  of fact are supported by substantial evidence in the record and the proper legal standards were

15  applied.  Schneider v. Comm'r of the Soc. Sec. Admin., 223 F.3d 968, 973 (9th Cir. 2000);

16  Morgan v. Comm'r of the Soc. Sec. Admin., 169 F.3d 595, 599 (9th Cir. 1999); Tackett v. Apfel,

17  180 F.3d 1094, 1097 (9th Cir. 1999).

18            The findings of the Commissioner as to any fact, if supported by substantial evidence, are

19  conclusive.  See Miller v. Heckler, 770 F.2d 845, 847 (9th Cir. 1985).  Substantial evidence is

20  more than a mere scintilla, but less than a preponderance.  Saelee v. Chater, 94 F.3d 520, 521 (9th

21  Cir. 1996).  "It means such evidence as a reasonable mind might accept as adequate to support a

22  conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. of

23  N.Y. v. N.L.R.B., 305 U.S. 197, 229 (1938)).  "While inferences from the record can constitute

24  substantial evidence, only those 'reasonably drawn from the record' will suffice."  Widmark v.

25  Barnhart, 454 F.3d 1063, 1066 (9th Cir. 2006) (citing Batson v. Comm'r of Soc. Sec. Admin.,

26  359 F.3d 1190, 1193 (9th Cir. 2004)).

27            Although this court cannot substitute its discretion for that of the Commissioner, the court

28  nonetheless must review the record as a whole, "weighing both the evidence that supports and the

1    evidence that detracts from the [Commissioner's] conclusion." <u>Desrosiers v. Sec'y of Health and</u>

2    <u>Hum. Servs.</u>, 846 F.2d 573, 576 (9th Cir. 1988); <u>see also</u> <u>Jones v. Heckler</u>, 760 F.2d 993, 995 (9th

3    Cir. 1985).

4         "The ALJ is responsible for determining credibility, resolving conflicts in medical

5    testimony, and resolving ambiguities." <u>Edlund v. Massanari</u>, 253 F.3d 1152, 1156 (9th Cir. 2001)

6    (citations omitted).  "Where the evidence is susceptible to more than one rational interpretation,

7    one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." <u>Thomas v.</u>

8    <u>Barnhart</u>, 278 F.3d 947, 954 (9th Cir. 2002).  However, the court may review only the reasons

9    stated by the ALJ in her decision "and may not affirm the ALJ on a ground upon which [s]he did

10    not rely." <u>Orn v. Astrue</u>, 495 F.3d 625, 630 (9th Cir. 2007); <u>see also</u> <u>Connett v. Barnhart</u>, 340

11    F.3d 871, 874 (9th Cir. 2003).

12         The Court will not reverse the Commissioner's decision if it is based on harmless error,

13    which exists only when it is "clear from the record that an ALJ's error was 'inconsequential to the

14    ultimate nondisability determination.'" <u>Robbins v. Soc. Sec. Admin.</u>, 466 F.3d 880, 885 (9th Cir.

15    2006) (quoting <u>Stout v. Comm'r, Soc. Sec. Admin.</u>, 454 F.3d 1050, 1055 (9th Cir. 2006)); <u>see</u>

16    <u>also</u> <u>Burch v. Barnhart</u>, 400 F.3d 676, 679 (9th Cir. 2005).

17                       ANALYSIS

18         Plaintiff seeks summary judgment on the grounds that the ALJ (1) failed to offer specific

19    and legitimate reasons for rejecting the opinions of plaintiff's treating physician, Dr. Carlos

20    Alvarez, ECF No. 14 at 5; and (2) erred in his evaluation of plaintiff's credibility, <u>id</u> at 10.  The

21    Commissioner opposes, arguing that the ALJ's decision is supported by substantial evidence and

22    is free from legal error.  ECF No. 15.

23    A.    <u>Relevant Background</u>

24         Following his September 16, 2009 back surgery, plaintiff was examined by his surgeon,

25    Dr. Rahimifar, on September 29, 2009.  AR 264.  The examination notes indicate that plaintiff's

26    leg pain was "completely resolved."  <u>Id.</u>  The examination notes also indicate that plaintiff was

27    covered by medical insurance.  <u>Id.</u>  Plaintiff was also examined by Dr. Michael Wells on

28    September 29, 2009.  Dr. Wells noted that "[p]edicle screws and stabilization rods are in place

1 | [and] [r]emaining levels appear to be normal."  AR 278.

2 |       Plaintiff was examined again by Dr. Rahimifar on November 30, 2009.  AR 262.  Dr.

3 | Rahimifar noted that plaintiff was doing "very well [post-surgery]."  Id.  Dr. Rahimifar

4 | recommended plaintiff utilize hydrotherapy and dynamic soft tissue mobilization ("DSTM").  Id.

5 | The examination notes indicate that no medications were prescribed and plaintiff was covered by

6 | medical insurance.  Id.

7 |       Plaintiff had a follow-up appointment on December 10, 2009 with his primary physician,

8 | Dr. Robert W. Hagen.  AR 236.  The examination notes show that plaintiff was not on any

9 | medications and his back was "healing well."  Id.  Plaintiff was advised not to lift more than

10 | thirty pounds and to do light duty work approximately three to four hours per day.  Id.

11 |       On February 4, 2010, Dr. Rahimifar again prescribed plaintiff hydrotherapy and dynamic

12 | soft tissue mobilization.  AR 260.

13 |       On February 22, 2010, plaintiff was examined by Dr. Rahimifar.  AR 277.  The

14 | examination notes indicate that the "[v]ertebral bodies are of normal height and alignment."  Id.

15 |       On March 4, 2010, plaintiff was examined by Dr. David Field.  AR 291.  Dr. Field's

16 | examination notes indicate that plaintiff "has improved leg pain" and still has some lower back

17 | pain radiating to his back and hips with prolonged sitting and standing.  Id.  Plaintiff was found to

18 | be neurologically intact and he was advised to take 600 mg of Ibuprofen[1] three times per day and

19 | return to the clinic in four weeks.  Id.; see also AR 259.  The examination notes also indicate that

20 | plaintiff was covered by medical insurance.  AR 291.

21 |       On April 6, 2010, plaintiff was examined by Dr. Rahimifar.  AR 258.  The examination

22 | notes indicate that plaintiff complained of low back pain radiating to his hips and plaintiff was

23 | taking Ibuprofen at the time of the examination.  Id.  Dr. Rahimifar prescribed plaintiff Tramadol

24 | ////

25 |

26 | ──────────────
[1]  Nonprescription ibuprofen is used to relieve minor aches and pain from, among other things,

27 | muscle aches and backaches.  Ibuprofen is in a class of medications called nonsteroidal anti-inflammatory drugs ("NSAIDs").  Ibuprofen, MedlinePlus, http://www.nlm.nih.gov/medlineplus/medlineplus.html (last updated October 1, 2010).

28 |

for pain management and Decadron,[2] AR 256–57, and recommended that plaintiff return for a

follow-up appointment in three months, AR 258. The examination notes also indicate plaintiff

was covered by medical insurance. AR 258.

On January 10, 2011, plaintiff filled out a Function Report. AR 205–12. Plaintiff stated

that he generally lies in bed or in a recliner all day and on most days he takes his dogs on a walk

for approximately fifteen minutes. AR 205–06. With regard to house and yard work, plaintiff

stated that he can do light cleaning such as dusting and dishes and mow the yard one to two times

per week. AR 207. Plaintiff stated that he plays video games and watches television most of the

day. AR 209. Plaintiff also stated that he can walk for approximately thirty minutes before he

needs to stop and rest, and he can resume walking after resting for "a couple hours." AR 210.

Finally, plaintiff stated that he could lift twenty pounds, stand, walk and sit for thirty minutes to

an hour, and climb stairs for fifteen minutes. AR 212.

On April 19, 2011, Dr. Kristof Siciarz, a Board Eligible Doctor in Internal Medicine,

performed an Internal Medicine Evaluation, which included a physical examination "based on

formal testing as well as observations of [plaintiff's] spontaneous actions." AR 294–98. The

report indicates that plaintiff was taking Ibuprofen at the time of the examination and noted that

plaintiff was "in no distress." AR 295–96. With regard to plaintiff's back, the report shows that

there was no spinal tenderness, no paraspinal spasm or tenderness and a straight-leg raise test was

negative bilaterally at 90 degrees, both sitting and supine. AR 296. Plaintiff's range of motion of

the back was 25 degrees for lateral flexion, 20 degrees for extension and 90 degrees for forward

flexion. AR 296–97. The range of motion for plaintiff's shoulders, elbows, wrists and hands,

hips, knees and ankles was grossly normal bilaterally. AR 297. Finally, the report states that the

functional capacity is limited in plaintiff and he "can lift or carry 20 pounds occasionally, lift or

carry 10 pounds frequently, and can stand/walk six hours cumulatively in an eight hour day." AR

---

[2]  Tramadol is used to relieve moderate to moderately severe pain and is in a class of medications called opiate (narcotic) analgesics. Tramadol, MedlinePlus (last updated October 15, 2013). Decadron is a corticosteroid and is used to treat certain forms of arthritis, among other things. Dexamethasone Oral, MedlinePlus (last updated September 1, 2010).

1    298.  Plaintiff can also "sit without restrictions."  Id.

2           On April 28, 2011, Dr. Stephen A. Whaley, a medical consultant, completed a Physical

3    Residual Functional Capacity Assessment.  AR 300–07.  Dr. Whaley indicated that plaintiff could

4    lift twenty pounds occasionally and ten pounds frequently.  AR 301.  Plaintiff could stand and/or

5    walk and sit with normal breaks for a total of approximately six hours in an eight-hour workday

6    and could push and/or pull an unlimited amount within his lifting and carrying limits.  Id.  Dr.

7    Whaley's assessment comments indicate that plaintiff stated he could stand/walk/sit for thirty

8    minutes to an hour, can walk for thirty minutes before having to stop for rest and can lift twenty

9    pounds.  AR 307.  A straight-leg rest was negative and there was "no tenderness to back."  Id.

10   Dr. Whaley concluded that plaintiff "[a]ppears capable of light work."  Id.

11          On June 14, 2011, plaintiff was examined for back pain.  AR 326–27.  The examination

12   notes indicate that plaintiff was not currently on any medications and his musculoskeletal

13   examination was normal.  Id.  No medications were prescribed and plaintiff was covered by

14   medical insurance.  AR 327.

15          On June 23, 2011, Dr. A. Khong, a medical consultant, completed a Physical Residual

16   Functional Capacity Assessment.  AR 308–12.  Dr. Khong reached the same conclusions as Dr.

17   Whaley with regard to plaintiff's exertional limitations, namely that plaintiff could occasionally

18   lift twenty pounds, frequently lift ten pounds, and stand/walk/sit approximately six hours in an

19   eight-hour workday.  AR 309.  With regard to plaintiff's postural limitations, Dr. Khong indicated

20   that plaintiff could climb ramps/stairs/ladders/ropes/scaffolds, stoop, kneel, crouch and crawl

21   occasionally and balance frequently.  AR 310.  Dr. Khong also completed a Case Analysis

22   addressing plaintiff's request for reconsideration.  AR 313–15.  Dr. Khong reviewed Dr.

23   Whaley's April 28, 2011 findings and noted that plaintiff's medical records were "rather cursory"

24   following his 2009 surgery and plaintiff was "notably neurologically intact" by March 2010.  AR

25   314.  Dr. Khong affirmed Dr. Whaley's initial Residual Functional Capacity Assessment.  Id.

26          On July 11, 2011, Dr. Carlos A. Alvarez completed a Residual Functional Capacity

27   Questionnaire.  AR 317–18.  The questionnaire indicates that Dr. Alvarez saw plaintiff for two to

28   three months.  AR 317.  Plaintiff's diagnosis was chronic low back pain and he was taking

Ibuprofen, Tramdol and Vicoden.  Id.  Dr. Alvarez indicates that plaintiff could sit for thirty minutes at a time and stand/walk for thirty minutes at a time, and plaintiff could sit for three hours in an eight-hour workday and stand/walk for three hours in an eight-hour workday.  Id.  Dr. Alvarez stated that plaintiff could lift less than ten pounds occasionally and has limitations doing repetitive reaching, handling or fingering.  Id.

On July 25, 2011, plaintiff was treated for back pain.  AR 324.  The examination notes indicate that plaintiff was taking what appears to be 600 mg of Ibuprofen at the time and plaintiff was not experiencing spasms.  Id.  No further medications were prescribed and no testing was ordered.  Id.  Plaintiff was covered by medical insurance.  Id.

On September 23, 2011, plaintiff was again examined for low back pain.  AR 322–23.  The examination notes indicate that plaintiff was taking Cymbalta and a second medication that appears to be 800 mg of Ibuprofen.  AR 322.  Plaintiff paid for the examination with cash.  AR 322.

On an undated form received on October 19, 2011, plaintiff summarized his recent medical treatment, stating that because he is on a limited income his physician "is trying to find a medication that will target [his] pain" and plaintiff "had expressed the desire to not have to rely on addictive [and] harsh painkillers unless absolutely necessary."  AR 228.  Plaintiff stated that he was currently taking Cymbalta for lower back pain and Ibuprofen for back and leg pain.  AR 229.

On October 31, 2011, plaintiff was examined for lower back pain.  AR 319–21.  The examination notes indicate that plaintiff was taking the medication Cymbalta.  AR 319.  No tests were ordered and it does not appear that any pain medications were prescribed following the examination.  AR 320.  Plaintiff paid for the examination with cash.  AR 319.

Plaintiff was examined on November 21, 2011, for low back pain.  AR 332–33.  Plaintiff was taking Cymbalta at the time of the examination.  AR 332.  It does not appear that plaintiff was prescribed any additional medications, that any tests were ordered, or that plaintiff was referred to another provider.  AR 333.

On January 3, 2012, plaintiff was examined for back pain.  AR 330–31.  The examination

////

notes indicate that plaintiff was taking Neurontin[3] at the time of the examination but it did not "seem to help due to side effects."  Id.  Plaintiff was prescribed Robaxin,[4] Cymbalta and Ibuprofen three times per day and was referred to a chiropractor.  AR 331.  Plaintiff's musculoskeletal exam was abnormal.  Id.

On February 22, 2012, plaintiff testified regarding his medical treatment, symptoms and daily activities.  AR 37–56.  When questioned by the ALJ regarding why plaintiff stopped treatment in April 2010, plaintiff explained as follows:

> Because basically I didn't feel that they had anything else to do for me other than recommend me another surgery, which I wasn't really wanting to do.  That's when I kind of just went back to my general practitioner and tried to start doing different things with them like trying different medications and stuff like that to see if anything they could give me might help.

AR 44.  The ALJ questioned plaintiff regarding his gap in treatment between April 2010 and June 2011.  Id.  Plaintiff explained as follows:

> A  I -- basically I had -- I think honestly I had just kind of -- a point -- I just kind of gave up hope of someone being able to help me with it, I guess.  I -- yeah, it's --
>
> Q  Well, did -- were you in pain?
>
> A  Yeah.  I mean, I've always been in pain.  It's just --
>
> Q  Well, during that period of time, did you try to seek some relief from a doctor for that pain?
>
> A  I had just basically kept going with Advil I had been taking for the -- well, most of the time since I had the back pain.  But no, other than that I just kind of had to resign myself to the fact that I was going to be in pain and, you know, there was nothing really I could do about it.

AR 45.  Plaintiff testified that the pain he was experiencing at that time was "[n]ot really" any different than it was when he stopped his treatment in April 2010, explaining that "it's just been a

---

[3]  Neurontin is used to help control certain types of seizures in people who have epilepsy and is in a class of medications called anticonvulsants.  Gabapentin, MedlinePlus (last updated July 15, 2011).
[4]  Robaxin is used "with rest, physical therapy, and other measures to relax muscles and relieve pain and discomfort" and is in a class of medications called muscle relaxants.  Methocarbamol, MedlinePlus (last updated October 1, 2010).

1    -- pretty much a constant pain."  Id.  Plaintiff further testified that he has a dull ache in the middle

2    of his back that radiates down to his hip joints.  AR 46.  Plaintiff testified that laying down in a

3    recliner or sitting are about the only positions where he can feel like he is pain-free and he tries to

4    sit in his recliner all day and "not do too much."  AR 45–46; see also AR 53 (plaintiff confirmed

5    during his testimony that he is "basically off [his] feet all day long").  The ALJ asked plaintiff

6    what would be considered "too much" that increases the pain plaintiff's back and plaintiff

7    explained as follows:

8    > Well even -- sometimes my brother will bring his kids down on the
     > weekend. I'll try to, you know, sit in a certain position and play
9    > with them or do stuff on the floor or whatever.  And, you know,
     > even doing that for a half an hour to an hour or something, the next
10   > day I'll feel really sore and stiff just from doing that little -- I mean,
     > it's not even really doing activities; it's just sitting in a -- you know,
11   > in that kind of a position with them for that little amount of time.  I
     > also like -- before , I used to like to get out in the garden and do a
12   > lot of gardening kind of stuff.  And I can't really do that anymore.  I
     > attempt to do the -- mow the lawn on the weekends in the
13   > summertime.  And the next day after I've done that, it's -- I mean,
     > it's pretty bad.  The pain is a lot worse.

14

15   AR 47.  When asked whether plaintiff helps his wife around the house with daily tasks plaintiff

16   responded that he helps "[f]rom time to time" and his wife "may ask [him] to come and help do a

17   little thing with dinner or help her around the house doing something, and [he'll] – if [he] can

18   help her, [he does] try."  AR 48.  Plaintiff testified that his wife is "pretty independent and likes

19   doing . . . stuff herself" but he does "try to help her sometimes unloading the laundry and stuff

20   and things like that . . ."  AR 48–49.  Plaintiff explained that "[f]or the most part" he is "just kind

21   of sitting in [his] chair and just reclining."  AR 49.  Plaintiff testified that of the ten to twelve

22   hours he is awake during the day he is sitting, but does get up and walk his two dogs.  AR 49–50.

23   Plaintiff testified that he can sit in an upright position for a half hour to an hour, recline for six to

24   seven hours in an eight-hour day and stand and walk for a half hour to an hour.  AR 50.  Plaintiff

25   testified that he was on "muscle relaxants and ibuprofen" at the time of the hearing and said he

26   tries "to keep away from being prescribed very strong stuff like Vicodin" because he does not

27   want to "get dependent on a . . . very strong painkiller like that."  AR 51.  Plaintiff testified that

28   he can lift "[t]en, maybe 20 [pounds] at the most" and when he tries to lift more he can feel a

1  strain on his back.  AR 52.

2          Plaintiff confirmed during his testimony that he explained to his doctor, Dr. Alvarez, that

3  he is off his feet seven out of eight hours per day.  AR 53.  When asked what Dr. Alvarez told

4  plaintiff, plaintiff explained as follows:

> Basically he's just -- he's been -- like I say, he's been prescribing
> me different medications to kind of help with the pain.  He told me
> about some stretches I could do to help release muscle tension in
> my lower back.  Other than that, he hasn't really told me too much,
> I mean, about what else I can do other than, you know, just go with
> stronger medications.

9  Id.  When asked whether Dr. Alvarez suggested that plaintiff see a neurosurgeon or an

10  orthopedist, plaintiff responded that Dr. Alvarez did not suggest such treatment and explained that

11  he does not have insurance so cost is a "big issue" for him.  AR 53–54.  Plaintiff also testified that

12  while he was referred to a chiropractor he did not pursue it, explaining that the first visit costs

13  approximately $150.  AR 54.

14  B.      Analysis of Opinion Evidence

15          1.      Legal Standards

16          In the Ninth Circuit, courts "distinguish among the opinions of three types of physicians:

17  (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the

18  claimant (examining physicians); and (3) those who neither examine nor treat the claimant

19  (nonexamining physicians)."  Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995).  Generally, more

20  weight should be given to a treating physician's opinion than to those who do not treat the

21  claimant.  Id.  A treating physician's opinion that is given controlling weight "must be adopted."

22  See Social Security Ruling ("SSR") 99–2p ("Giving Controlling Weight to Treating Source

23  Medical Opinions," at ¶ 6).[5]  To accord a treating physician's opinion controlling weight, the

24  opinion must be (1) "well-supported by medically acceptable clinical and laboratory diagnostic

25

26  _____

[5]  "SSRs do not carry the 'force of law,' but they are binding on ALJs nonetheless."  Bray v.
Comm'r of Soc. Sec. Admin., 554 F.3d 1219, 1224 (9th Cir. 2009).  The Ninth Circuit gives them
27  deference so long as they do not produce "a result inconsistent with the statute and regulations."
Bunnell v. Sullivan, 947 F.2d 341, 346 n.3 (9th Cir. 1991).

28

1  techniques;" and (2) "'not inconsistent' with the other substantial evidence in the case record."

2  See Orn, 495 F.3d at 631.  "Not inconsistent" means that "no other substantial evidence in the

3  case record . . . contradicts or conflicts with the opinion;" "substantial evidence" means "more

4  than a mere scintilla" such that a "reasonable mind would accept as adequate to support a

5  conclusion."  SSR 96–7p (Explanation of Terms).

6       "If a treating doctor's opinion is not contradicted by another doctor (i.e., there are no other

7  opinions from examining or nonexamining sources), it may be rejected only for 'clear and

8  convincing' reasons supported by substantial evidence in the record."  See Ryan v. Comm'r of

9  Soc. Sec. Admin., 528 F.3d 1194, 1198 (9th Cir. 2008); Lester, 81 F.3d at 830.  "If the ALJ

10  rejects a treating or examining physician's opinion that is contradicted by another doctor, he must

11  provide specific, legitimate reasons based on substantial evidence in the record."  Valentine v.

12  Comm'r of Soc. Sec. Admin., 574 F.3d 685, 692 (9th Cir. 2009); Ryan, 528 F.3d at 1198.  "The

13  ALJ can meet this burden by setting out a detailed and thorough summary of the facts and

14  conflicting clinical evidence, stating his interpretation thereof, and making findings."  Magallanes

15  v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989).  Furthermore, "[w]hen an examining physician

16  relies on the same clinical findings as a treating physician, but differs only in his or her

17  conclusions, the conclusions of the examining physician are not 'substantial evidence.'"  Orn, 495

18  F.3d at 632.

19       Treating physicians' subjective judgments are important, and "properly play a part in their

20  medical evaluations."  Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988).  "The ALJ must

21  explain his own interpretations, and cannot merely list contrary opinions when stating that a

22  treating physician's opinion is unsupported."  Boardman v. Astrue, 286 F. App'x 397, 399–400

23  (9th Cir. 2008) (citing Regennitter v. Comm'r of Soc. Sec. Admin., 166 F.3d 1294 (9th Cir.

24  1999)).  If the ALJ fails to provide adequate reasons for rejecting a treating or examining

25  physician's opinion, the Ninth Circuit credits the opinion as a matter of law.  Benecke v.

26  Barnhart, 379 F.3d 587, 594 (9th Cir. 2004).

27       "If there is substantial evidence in the record contradicting the opinion of the treating

28  physician, the opinion of the treating physician is no longer entitled to 'controlling weight.'"

1   Orn, 495 F.3d at 632–33 (citing 20 C.F.R. § 404.1527(c)(2)).  However, the ALJ must still

2   consider the factors listed in § 404.1527(c)(2)-(6) in determining what weight to accord the

3   opinion of a treating physician.  "Even when contradicted by an opinion of an examining

4   physician that constitutes substantial evidence, the treating physician's opinion is 'still entitled to

5   deference.'"  Id. (citing SSR. 96–2p at 4, 61 Fed. Reg. at 34,491).  "In many cases, a treating

6   source's medical opinion will be entitled to the greatest weight and should be adopted, even if it

7   does not meet the test for controlling weight."  SSR 96–2p at 4, 61 Fed. Reg. at 34, 491.

8           2.      ALJ Decision

9           As noted, Dr. Alvarez found that plaintiff could sit for thirty minutes at a time, could

10  stand/walk for thirty minutes at a time, could sit for three hours in an eight-hour workday, and

11  could stand/walk for three hours in an eight-hour workday.  AR 317.  Dr. Alvarez also found that

12  plaintiff could lift less than ten pounds occasionally and has limitations doing repetitive

13  movements.  Id.

14          With regard to affording the opinion of treating physician Dr. Alvarez little weight, the

15  ALJ's decision found as follows:

16              Although Dr. Alvarez is a treating source, his opinion relies heavily
                on the subjective report of symptoms and limitations without
17              corroborating clinical findings on exam.  Dr. Alvarez is a general
                practitioner, ordered no testing, and never suggested that the
18              claimant see an orthopedist or neurologist.  Further, the claimant
                testified that he can lift 10-20 pounds and said he sits for the vast
19              majority of his day.  Dr. Alvarez' opinion is inconsistent with the
                evidence and is given little weight because the record shows the
20              claimant could perform sedentary work.

21  AR 28–29.  The ALJ afforded great, but not full, weight to the opinions of consulting examiner

22  Dr. Siciarz, who found that plaintiff's functional capacity is limited in that he "can lift or carry 20

23  pounds occasionally, lift or carry 10 pounds frequently, and can stand/walk six hours

24  cumulatively in an eight hour day" and can also "sit without restrictions."  AR 298.  The ALJ

25  stated the following reasons in support of his finding:

26              "Dr. Siciarz' findings on exam are consistent with the objective
                evidence of record and with the claimant's conservative treatment
27              since his successful surgery and are afforded great weight.
                However, the undersigned affords the claimant the benefit of any
28              doubt and given his testimony regarding limited ambulation, finds

1   that he is capable of performing a full range of sedentary work.

2   AR 29.

3       3.      Analysis

4       When, as here, "evidence in the record contradicts the opinion of a treating physician, the

5   ALJ must present 'specific and legitimate reasons' for discounting the treating physician's

6   opinion, supported by substantial evidence." Bray, 554 F.3d at 1228 (quoting Lester, 81 F.3d at

7   821).

8       In this case, the ALJ afforded Dr. Alvarez's opinion little weight because it relied heavily

9   on the subjective report of symptoms without corroborating clinical findings on exam and is

10  inconsistent with the evidence and claimant's daily activities.  AR 29.  The ALJ discussed

11  plaintiff's medical records in his opinion and provided several reasons for affording Dr. Alvarez's

12  opinion little weight.  First, the ALJ noted that during the same 2011 time frame that Dr. Alvarez

13  completed the Residual Functional Capacity Questionnaire, an examining physician, Dr. Siciarz,

14  examined plaintiff and observed that plaintiff was not in distress, had no paraspinal spasm or

15  tenderness and a straight-leg test was negative bilaterally at 90 degrees.  AR 28; see also AR 295–

16  96.  The ALJ recognized that Dr. Alvarez is a treating source, but pointed out that his opinion was

17  not supported by corroborating clinical findings, he ordered no testing, and did not suggest that

18  plaintiff see an orthopedist or neurologist.  AR 28–29; see also AR 317–33.  This finding is

19  supported by the record, which confirms that Dr. Alvarez did not order clinical testing or refer

20  plaintiff to a specialist other than a chiropractor.  AR 331; see Orn, 495 F.3d at 631 (to accord a

21  treating physician's opinion controlling weight, the opinion must be "well-supported by

22  medically acceptable clinical and laboratory diagnostic techniques"); see also 20 C.F.R.

23  § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support an opinion,

24  particularly medical signs and laboratory findings, the more weight we will give that opinion.").

25      The ALJ further noted that Dr. Alvarez's opinion, which states that plaintiff could sit for

26  only three hours in an eight-hour workday, AR 317, is inconsistent with plaintiff's own testimony

27  and daily activities.  AR 29; see 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent an

28  opinion is with the record as a whole, the more weight we will give to that opinion.").  The ALJ

1  properly supported this conclusion by pointing to plaintiff's testimony that he was off his feet

2  seven out of eight hours per day and "spends most of his day playing video games and watching

3  television." AR 29; see also AR 53 (plaintiff testified that he is "basically off [his] feet all day

4  long"); AR 209 (plaintiff testified that he plays video games and watches television most of the

5  day). The ALJ concluded that "Dr. Alvarez'[s] opinion is inconsistent with the evidence and is

6  given little weight because the record shows the claimant could perform sedentary work." Id.

7      While plaintiff takes issue with the ALJ's decision that states plaintiff saw Dr. Alvarez in

8  support of his disability claim, arguing that the ALJ's speculation should be rejected, ECF No. 16

9  at 4, this argument is not convincing. First, the record shows that Dr. Alvarez's examination

10  notes state that plaintiff was examined, in part, as a follow-up on his disability. AR 319 (October

11  31, 2011 examination notes describing plaintiff's chief complaint as "follow up disability"); AR

12  322 (same); AR 324 (same); AR 326 (same); AR 328 (summary of plaintiff's appointments

13  described as a follow-up on his disability). Moreover, the ALJ did not offer this as a reason for

14  affording Dr. Alvarez's opinion little weight, but rather stated in his summary of plaintiff's

15  medical records that in June 2011 plaintiff "returned for care in support of his disability claim."[6]

16  AR 28.

17      Finally, plaintiff argues that "the Court should reject the ALJ's attempt to cast Dr.

18  Alvarez's opinion as advocacy because he failed to establish any evidence of impropriety on

19  behalf of Dr. Alvarez." ECF No. 14 at 8. Plaintiff correctly points out that the ALJ noted that Dr.

20  Alvarez's opinion "relies heavily on the subjective report of symptoms and limitations." AR 28.

21  Without more, 8this reason may not be sufficient. See Lester, 81 F.3d at 832 ("'The Secretary

22  may not assume that doctors routinely lie in order to help their patients collect disability

23  benefits.'" (quoting Ratto v. Sec'y, Dept. of Health and Human Servs., 839 F. Supp. 1415, 1426

24  (D. Or. 1993))); see also Nguyen v. Chater, 100 F.3d 1462, 1465 (9th Cir. 1996) (the source of

25  report is a factor that justifies rejection only if there is evidence of actual impropriety or no

26   

_____

[6] The court notes that this reason was offered in support of the ALJ's determination regarding

27  plaintiff's credibility. AR 29 (finding plaintiff not credible in part because he "returned for care
only in support of his disability application"). It is therefore addressed in more detail below.

28   

1   medical basis for opinion (citing Saelee, 94 F.3d at 523)); Reddick v. Chater, 157 F.3d 715, 725–

2   26 (9th Cir. 1998) (ALJ erred in assuming that the treating physician's opinion was less credible

3   because his job was to be supportive of the patient).  Although the record contains no evidence

4   that Dr. Alvarez deliberately embellished his assessment of plaintiff's symptoms to assist him

5   with his benefits claim, the ALJ does note that his opinion was not corroborated by clinical

6   findings and is inconsistent with the evidence, thus implying that there is little medical basis for

7   his opinion.  AR 28–29.  However, even if the ALJ's rejection of Dr. Alvarez's opinion on this

8   ground was improper, any error was harmless because the ALJ articulated other legitimate

9   reasons that are legally sufficient and supported by substantial evidence in the record.  See

10  Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1162 (9th Cir. 2008); Batson, 359 F.3d

11  at 1196 ("When evidence reasonably supports either confirming or reversing the ALJ's decision,

12  we may not substitute our judgment for that of the ALJ." (citing Tackett, 180 F.3d at 1098)).

13          Because Dr. Alvarez's opinion was contradicted by other medical evidence in the record,

14  the ALJ had only to articulate specific and legitimate reasons for discounting it, supported by

15  substantial evidence.  The court concludes that the ALJ did so in this case.  While other evidence

16  in the record might justify a different determination, the ALJ's determination meets the applicable

17  legal standards and it is not the role of the court to second-guess the ALJ's decision when it is

18  supported by substantial evidence in the record.  See Rollins v. Massanari, 261 F.3d 853, 857 (9th

19  Cir. 2001).  Accordingly, the ALJ did not err in affording Dr. Alvarez's opinion little weight.

20  C.      Analysis of Credibility Determination

21          1.      Legal Standards

22          The ALJ is responsible for determining credibility and resolving ambiguities and conflicts

23  in the medical evidence.  See Reddick, 157 F.3d at 722.  Where the medical evidence in the

24  record is not conclusive, "questions of credibility and resolution of conflicts" are solely the

25  functions of the ALJ.  Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982).  In such cases,

26  "the ALJ's conclusion must be upheld."  Morgan, 169 F.3d at 601.

27          "In assessing the credibility of a claimant's testimony regarding subjective pain or the

28  intensity of symptoms, the ALJ engages in a two-step analysis."  Molina v. Astrue, 674 F.3d

16

1104, 1112 (9th Cir. 2012) (citing Vasquez v. Astrue, 572 F.3d 586, 591 (9th Cir. 2009)); see also

Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007).  "First, the ALJ must determine

whether the claimant has presented objective medical evidence of an underlying impairment

which could reasonably be expected to produce the pain or other symptoms alleged."  Vasquez,

572 F.3d at 591.  Second, "[i]f the claimant meets the first test and there is no evidence of

malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms

if she gives 'specific, clear and convincing reasons' for the rejection."  Id. (quoting Lingenfelter,

504 F.3d at 1036).  "General findings are insufficient; rather, the ALJ must identify what

testimony is not credible and what evidence undermines the claimant's complaints."  Lester, 81

F.3d at 834; see also Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993).  In determining a

claimant's credibility, the ALJ may consider "ordinary techniques of credibility evaluation" such

as reputation for lying, prior inconsistent statements concerning symptoms, and other testimony

that "appears less than candid."  Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996).  The ALJ

may also consider a claimant's work record and observations by physicians and other third parties

regarding the nature, onset, duration and frequency of symptoms.  Id.  While a "lack of medical

evidence cannot form the sole basis for discounting pain testimony, it is a factor that that ALJ can

consider on his credibility analysis."  Burch, 400 F.3d at 681.

The Ninth Circuit has found that the claimant is not required to show that his impairment

could be expected to cause the severity of the pain he claims, but only that it could cause some

degree of pain.  Lingenfelter, 504 F.3d at 1036 (finding that "the ALJ may not reject subjective

symptom testimony . . . simply because there is no showing that the impairment can reasonably

produce the degree of symptom alleged"); Smolen, 80 F.3d at 1282 (finding claimant must be

able to show that the impairment "could reasonably be expected to (not that it in fact did) produce

some degree of symptom"); Bunnell, 947 F.2d at 346–47 (concluding that the "adjudicator may

not discredit a claimant's testimony of pain and deny disability benefits solely because the degree

of pain alleged by the claimant is not supported by objective medical evidence").

    2.   ALJ Decision

As noted, the ALJ's March 2, 2012 opinion found, in part, that plaintiff has the residual

1   functional capacity to perform the full range of sedentary work.  AR 27.  The ALJ found that

2   plaintiff's "medically determinable impairment could reasonably be expected to cause the alleged

3   symptoms; however, the claimant's statements concerning the intensity, persistence and limiting

4   effects of these symptoms are not credible to the extent they are inconsistent with the above

5   residual functional capacity assessment."  Id.  Following a detailed summary of the record, the

6   ALJ provided the following explanation regarding plaintiff's credibility:

> The claimant has described daily activities that are not limited to the extent one would expect, given his complaints of disabling symptoms and limitations.  He testified that he gets down on the floor to play with his brother's children for 1/2 hour to an hour, mows the lawn, helps unload the laundry, takes his dogs for a walk, and washes dishes.  He spends his day sitting in a recliner, can walk a city block without any problem, can lift 10-20 pounds, has no problems attending to his personal care, and does light cleaning.  In his function report, the claimant also indicated that he frequently shops for video games on the computer and works on puzzles occasionally.  He said he spends most of his day playing video games and watching television, suggesting that he could spend his day performing sedentary work.  As noted above, the record reflects a gap of more than a year in the claimant's history of treatment and that he returned for care only in support of his disability application, suggesting that his symptoms are not as severe as alleged.  Although the claimant had back surgery, which indicates his symptoms were genuine, the record of routine and conservative treatment since his recovery from surgery indicates that the procedure was successful in relieving his symptoms.

18  AR 29 (citations omitted).

19          3.      Analysis

20          As noted, the ALJ offered three reasons in support of a finding that plaintiff's statements

21  concerning the intensity, persistence and limiting effects of his symptoms not credible:

22  (1) plaintiff had a gap of more than a year in his history of treatment and received routine and

23  conservative treatment; (2) plaintiff's daily activities are not consistent with his complaints of

24  disabling symptoms and limitations; and (3) plaintiff returned for care only in support of his

25  disability application.  AR 29.  Each finding will be discussed in turn.

26              a.      Gap in Treatment and Conservative Treatment

27          Plaintiff argues that "[a]ny gap in treatment would be explained by Mr. Shimer's loss of

28  insurance."  ECF No. 14 at 12.  Plaintiff counters the ALJ's credibility finding based on his

18

1    conservative treatment, arguing that plaintiff "underwent an invasive spine surgery" and

2    "ingested narcotic medications for pain relief."  ECF No. 16 at 6–7.

3          The ALJ referenced the gap in plaintiff's treatment and the minimal treatment provided

4    for plaintiff as reasons for finding plaintiff not credible.  The ALJ noted, among other things, that

5    plaintiff's medical records show his leg and back pain were completely resolved in late 2009

6    following his surgery and in early 2010 plaintiff "reported only occasional low back pain."  AR

7    28.  The ALJ also observed that plaintiff did not seek medical treatment for more than a year

8    between April 2010 and June 2011.  Id.  Following this gap in treatment, the ALJ noted that

9    plaintiff "reported ongoing back pain but treatment notes contain no objective signs on exam."

10   Id.  The ALJ continues, noting that "[d]uring a September 2011 exam, the claimant was

11   neurologically intact" and "[t]wo months later, he was referred for chiropractic care."  Id.

12         A conservative treatment history and failure to seek medical treatment are legitimate bases

13   for an ALJ to discount a claimant's credibility regarding the severity of symptoms.  See

14   Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008); see also Fair v. Bowen, 885 F.2d

15   597, 604 (9th Cir. 1989) (finding that the claimant's allegations of persistent, severe pain and

16   discomfort were belied by "minimal conservative treatment").

17         Here, the ALJ did not err in relying on the gap in treatment and conservative treatment in

18   the record as a basis for finding plaintiff less than credible.  The record shows that plaintiff did

19   not require surgery or other invasive procedures for his pain management following his back

20   surgery in September 2009, nor did any physician suggest such procedures in their examination

21   notes.  On the contrary, plaintiff's treatment between September 2009 and April 2010 consisted

22   of a recommendation to utilize hydrotherapy and dynamic soft tissue mobilization ("DSTM")

23   with a limited number of prescriptions for pain medication.  See AR 262 (November 30, 2009

24   examination by Dr. Rahimifar recommending plaintiff utilize hydrotherapy and DSTM with no

25   pain medication prescribed); AR 260 (February 4, 2010 prescription by Dr. Rahimifar

26   recommending same with no pain medication prescribed); see also AR 236 (plaintiff was not

27   taking any medications when he was examined on December 10, 2009); AR 291 (plaintiff was

28   advised to take 600 mg Ibuprofen during his March 4, 2010 examination); AR 256–58 (plaintiff

1    was taking Ibuprofen at the time of his April 6, 2010 examination and was prescribed Tramadol

2    and Decadron for pain management).  Following a fourteen month gap in treatment, plaintiff's

3    treatment resumed and again consisted of no recommendation for invasive procedures or further

4    testing and few prescriptions for pain medication.  See AR 327 (no medications prescribed or

5    further testing following June 14, 2011 examination); AR 324 (same); AR 320 (same); AR 333

6    (same); see also AR 322 (plaintiff was taking Cymbalta and Ibuprofen at the time of his

7    September 23, 2011 examination); AR 330–31 (plaintiff was taking Neurontin at the time of his

8    January 3, 2012 examination, was prescribed Robaxin, Cymbalta and Ibuprofen three times per

9    day and was referred to a chiropractor).  Further, the fact that plaintiff did not seek out treatment

10   for fourteen months or more aggressive treatment beyond pain medications "is powerful evidence

11   regarding the extent to which [he] was in pain."  Burch, 400 F.3d at 681.  The court concludes

12   that the ALJ's findings are supported by substantial evidence.  See Parra v. Astrue, 481 F.3d 742,

13   751 (9th Cir. 2007) ("[E]vidence of 'conservative treatment' is sufficient to discount a claimant's

14   testimony regarding severity of an impairment." (citation omitted)).

15          With regard to plaintiff's argument that he "ingested narcotic medications for pain relief,"

16   which suggests his treatment was not conservative, ECF No. 16 at 6–7, this argument is

17   unavailing.  First, plaintiff was only prescribed narcotics on one occasion following his back

18   surgery between November 2009 and January 2012.  AR 256–57 (Dr. Rahimifar prescribed

19   plaintiff Tramadol for pain management following his April 6, 2010 examination).  The

20   remaining medications plaintiff took throughout this period are not considered narcotics.

21   Moreover, plaintiff specifically testified that he tries "to keep away from being prescribed . . .

22   strong painkillers."  AR 51.  Second, the case cited by plaintiff for the proposition that ingesting

23   narcotic medications constitutes more than conservative treatment also noted that in addition to

24   taking narcotic pain medications the plaintiff "was found to be a candidate for neurosurgical

25   intervention . . . ."  Tunstell v. Astrue, No. CV 11–9462–SP, 2012 WL 3765139, at *4 (C.D. Cal.

26   Aug. 30, 2012).  Here, plaintiff was prescribed narcotics once and nothing in the records show

27   that plaintiff was recommended as a candidate for any subsequent invasive treatment such as

28   surgery following the September 2009 operation, which, as noted by his surgeon, improved his

1   condition.  See AR 262 (November 30, 2009 examination notes by Dr. Rahimifar noting plaintiff

2   was doing "very well [post-surgery]").  While plaintiff testified that he "didn't feel that [his

3   physicians] had anything else to do for [him] other than recommend [him] another surgery," AR

4   44, his testimony is not corroborated by any medical records indicating a second surgery was in

5   fact recommended to plaintiff.  Moreover, the Tunstell opinion addressed an ALJ's rejection of a

6   plaintiff's testimony based on the plaintiff's non-use of strong narcotics, finding that the plaintiff

7   in fact used narcotic pain medication as prescribed by physicians.  Tunstell, 2012 WL 3765139, at

8   *4.  The ALJ did not cite such a reason in this case.  Instead, the ALJ found that plaintiff's

9   treatment was conservative based on the fact that plaintiff was referred for chiropractic care, had

10  normal examinations with no objective signs, had no testing performed and was not referred to an

11  orthopedist or neurologist.  AR 28–29.  The court finds that the ALJ's reasons are supported by

12  substantial evidence.

13      With regard to plaintiff's argument that his failure to seek treatment was due to his loss of

14  insurance, ECF No. 14 at 12, this argument is not persuasive.  "[A]n unexplained, or inadequately

15  explained, failure to seek treatment or follow a prescribed course of treatment . . . can cast doubt

16  on the sincerity of [a] claimant's pain testimony."  Fair, 885 F.2d at 603.  However, the ALJ may

17  not reject symptom testimony where the claimant provides "evidence of a good reason for not

18  [seeking treatment]."  Smolen, 80 F.3d at 1284 (citing Bunnell, 947 F.2d at 346; Fair, 885 F.2d at

19  602).  Where a claimant suffers from financial hardships, a failure to obtain treatment is not a

20  sufficient reason to deny benefits.  See Gamble v. Chater, 68 F.3d 319, 320–22 (9th Cir. 1995)

21  ("'It flies in the face of the patent purposes of the Social Security Act to deny benefits to someone

22  because he is too poor to obtain medical treatment that may help him.'" (quoting Gordon v.

23  Schweiker, 725 F.2d 231, 237 (4th Cir. 1984))); see also Regennitter, 166 F.3d at 1297 (failure to

24  follow treatment plan is not a legitimate reason for rejecting a claimant's pain testimony when the

25  failure is due to lack of resources).

26      Here, while plaintiff testified that he was not able to afford regular medical treatment

27  because he lost his insurance, the fact that plaintiff sought and received medical treatment and

28  medications on several occasions, including on September 23, 2011 and October 31, 2011 when

1  he paid for his examination with cash, undercuts plaintiff's testimony.  See, e.g., AR 319, 322

2  (examination notes indicating plaintiff paid for treatment with cash).  Moreover, plaintiff's

3  testimony that he did not try to seek some relief from a doctor between April 2010 and June 2011

4  because he "had just basically kept going with Advil" and "just kind of had to resign [him]self to

5  the fact that he was going to be in pain and . . . there was nothing really [he] could do about it,"

6  AR 45, suggests that plaintiff made the decision to forgo medical treatment, not that he was

7  unable to obtain treatment because of a loss of insurance.

8         Thus, the ALJ did not err in finding plaintiff not credible on the ground that he had a gap

9  in treatment and received only conservative treatment.

10              a.      Daily Activities

11         Plaintiff argues that "the ALJ's cited activities are dismal at best and the ALJ took many

12  of those activities out of context."  ECF No. 14 at 12.

13         An adjudicator may consider a claimant's daily activities when determining the credibility

14  of the claimant's allegations of disabling pain.  Bunnell, 947 F.2d at 346 (citing SSR 88-13).  "[I]f

15  the claimant engages in numerous daily activities involving skills that could be transferred to the

16  workplace, an adjudicator may discredit the claimant's allegations upon making specific findings

17  relating to the claimant's daily activities."  Bunnell, 947 F.2d at 346 (citing Fair, 885 F.2d at 603).

18         Here, the ALJ found that plaintiff's daily activities are not limited to the extent one would

19  expect in light of his complaints of disabling symptoms.  The ALJ supported this conclusion with

20  the following observations:

21              [Plaintiff] testified that he gets down on the floor to play with his
               brother's children for 1/2 hour to an hour, mows the lawn, helps
22              unload the laundry, takes his dogs for a walk, and washes dishes.
               He spends his day sitting in a recliner, can walk a city block
23              without any problem, can lift 10-20 pounds, has no problems
               attending to his personal care, and does light cleaning.  In his
24              functional report, the claimant also indicated that he frequently
               shops for video games on the computer and works on puzzles
25              occasionally.  He said he spends most of his day playing video
               games and watching television, suggesting that he could spend his
26              day performing sedentary work.

27  AR 29.  The court finds that the ALJ's decision is supported by substantial evidence in the record.

28  As explained, plaintiff testified that he tries to play with his brother's children but is sore and stiff

22

the next day and attempts to mow the lawn but that the next day the pain is worse.  AR 47.

Plaintiff also testified that while his wife is "independent and likes doing  . . . stuff herself," he

does try to help her with laundry and other household chores, but for the most part he sits in his

chair reclining for most of the ten to twelve hours he is awake during the day, with the exception

of taking his dogs for a walk for approximately thirty minutes.  AR 48–50; see also AR 207

(plaintiff's Function Report indicating that he lies in bed or in a recliner all day and on most days

takes his dogs on a walk); AR 207 (plaintiff's Function Report indicating that he can do light

cleaning such as dusting and dishes and mow the yard one to two times per week).  To the extent

plaintiff argues that the ALJ took plaintiff's testimony regarding playing with his brother's

children and mowing the lawn "out of context," ECF No. 14 at 12, any err in this regard is

considered harmless as the remaining activities cited by the ALJ are supported by the record,

which includes plaintiff's testimony that he sits or reclines for most of his day and helps his wife

with some household chores.  See, e.g., Fair, 885 F.2d at 603 (if "a claimant is able to perform

household chores and other activities that involve many of the same physical tasks as a particular

type of job, it would not be farfetched for an ALJ to conclude that the claimant's pain does not

prevent the claimant from working").  Accordingly, the ALJ did make sufficiently specific

findings to support his decision that plaintiff's statements concerning the intensity, persistence

and limiting effects of his symptoms were not entirely credible.

                    **b.**          **Treatment Only in Support of Disability Application**

Plaintiff argues in his reply brief that whether he returned to treatment in support of his

filing for disability benefits is speculative and plaintiff "began having problems and sought

treatment to alleviate those problems."  ECF No. 16 at 6.  Plaintiff cites no authority in support of

this argument.  However, the court finds this reason may not be sufficient because the medical

treatment records following plaintiff's gap in treatment indicate he was experiencing some level

of lower back pain.  Regardless, when there is substantial evidence supporting the ALJ's decision

and the error does not affect the ultimate nondisability determination, the error is harmless.  See

Carmickle, 533 F.3d at 1162; Stout, 454 F.3d at 1055; Batson, 359 F.3d at 1195–97.  In this case,

in light of the remaining lawful reasons stated by the ALJ for rejecting plaintiff's testimony, any

1    error the ALJ may have committed in in this regard is harmless.  <u>Batson</u>, 359 F.3d at 1197

2    (concluding that, even if the record did not support one of the ALJ's stated reasons for

3    disbelieving a claimant's testimony, the error was harmless) (citing  <u>Curry v. Sullivan</u>, 925 F.2d

4    1127, 1131 (9th Cir. 1990)).

5                                                    CONCLUSION

6            For these reasons, the court finds that the ALJ has provided specific, legitimate reasons

7    supported by substantial evidence for affording Dr. Alvarez's opinion little weight and finding

8    plaintiff not entirely credible.  Because the ALJ's disability determination is supported by

9    substantial evidence, it is not erroneous.

10           Accordingly, for the reasons stated above, IT IS HEREBY ORDERED that:

11           1.        Plaintiff's motion for summary judgment, ECF No. 14, is denied; and

12           2.        The Clerk of the Court is directed to enter judgment in the Commissioner's favor.

13   DATED: December 23, 2014

14

15                                                    ALLISON CLAIRE
                                                     UNITED STATES MAGISTRATE JUDGE

16

17

18

19

20

21

22

23

24

25

26

27

28

                                                        24